IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RUBIN STEWART, #400781 | * | |
| Plaintiff, | | |
| v. | * | CIVIL ACTION NO. RWT-13-3557 |
| DR. ANDREW MOULTRIE, *et al*. | * | |
| Defendants. | | |

\*\*\*\*\*

**<u>MEMORANDUM OPINION</u>**

On November 25, 2013, Jessup Correctional Institution ("JCI") inmate Rubin Stewart filed a civil rights action by mailing a letter to the Clerk. ECF No. 1. In his letter, Stewart explained that he had been poked in the eye during a football game at the Baltimore City Detention Center ("BCDC") two years earlier. *Id.* He was told that he suffered from a detached retina, and informed that he would see an outside specialist in sixty to ninety days. *Id.* Stewart claimed that five months prior to sending the letter, he lost the vision in his eye, and yet no procedures have occurred. *Id.* After his initial letter, Stewart filed a 42 U.S.C. § 1983 Amended Complaint. ECF No. 3. He named as Defendants Damon Fayall, the Health Services Administrator for the Jessup state prison region; Dr. Andrew Moultrie, the former Medical Director for JCI who also provides physician services to inmates; Physician's Assistant ("P.A.") Moss; and Nurse Janat, who is not mentioned in the Complaint, was never served, and has not participated in the litigation to date. ECF No. 3. Stewart seeks damages for his pain and suffering. *Id.* Because Stewart has not shown the Defendants were recklessly indifferent to his medical issue, his complaint shall be dismissed.

I.     PROCEDURAL HISTORY

Defendants previously filed Motions to Dismiss or, in the Alternative, Motions for Summary Judgment, a Supplemental Motion for Summary Judgment, and a Motion to Seal. ECF Nos. 15, 18, 20 and 21.  Stewart filed an Opposition. ECF No. 17, and Defendants filed a Reply, ECF No. 19.

On March 11, 2015, the Court granted the Motion to Seal, denied the dispositive motions without prejudice, and granted Defendants additional time to file a renewed Motion for Summary Judgment and a status report regarding Stewart's continued eye care.  ECF No. 24.  The Court observed Stewart's medical intake records upon his admission to JCI had not been provided and were needed to determine what Defendants knew about Stewart's condition. *Id.* at 3.

Defendants have now filed a renewed Motion for Summary Judgment,[1] a Status Report, a Motion to Dismiss, and exhibits with Stewart's additional medical records.[2] ECF Nos. 27, 29, 30 and 32.  In response, Stewart requested that judgment be entered in his favor. ECF No. 34.  The case may be determined without oral argument.  *See* Local Rule 105.6. (D. Md. 2014).  For reasons that follow, Defendants' Motions shall be granted.

II.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty*

---

[1] The Maryland Department of Public Safety and Correctional Services changed its contractual health care provider for inmates in July of 2012.  Defendants have renewed their Motion for Summary Judgment for the time period after July 1, 2012, when employed by Wexford Health Sources, Inc. and adopt and encorporate the Exhibits and Affidavits previously filed.  ECF No. 27.  Defendants, through a different law firm, have filed a Motion to Dismiss for the time period prior to July 1, 2012, when employed by Corizon, Inc.  They likewise rely on prior exhibits.  ECF No. 32.  The Court shall refer to these materials.

[2] As will be discussed *infra*, Stewart did not have a second intake exam upon admission to JCI.

*Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The moving party bears the burden of showing that there is no genuine dispute as to any material fact.  However, no genuine dispute of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof.  *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

III.   DISCUSSION

    A.   Denial of Medical Care

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants—or their failure to act—amounted to deliberate indifference to his serious medical needs.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).   Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but recklessly failed to provide medical attention or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837, 839–40 (1994).  A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko*, 535 F.3d at 241 (citing to *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F. 3d 336, 340 n.2

(4th Cir. 1997). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.

    B.    Stewart's Medical Care

        a.    Medical Care at BCDC

Stewart is a twenty-seven year old male with a medical history significant for a left eye retinal detachment and Hepatitis C ("HCV"). *See generally* ECF No. 15-6. The records indicate that on November 29, 2011, while confined at the BCDC, Stewart was seen by sick-call staff for evaluation of his left eye, which he claimed had been hit and scratched while playing sports. *Id.* at 13–14.[3] He was provided Motrin, as well as a cold pack, eye wash, and rinse. *Id.* On December 6, 2011, he was seen by Registered Nurse Practitioner ("N.P.") Nathan McKoy for his reported left eye discomfort. A visual acuity test could not be performed on the left eye as it was found to be excessively tearing and red. *Id*. at 15–16, 122–23. Stewart was advised that he would be referred to the optometrist and was prescribed an antibiotic ointment in the interim. *Id*. On December 19, 2011, he was seen by N.P. Jared Muhati for blurry eyesight, but the redness had subsided. *Id.* at 17. Stewart's optometry consult was noted. *Id*. On January 27, 2012, Stewart submitted a sick-call slip complaining, "My eye is to the point where I can't see out of it." He was seen by Nurse Cletus Agha, who noted that a consult for an "eye specialist" had been made. *Id.* at 20. On February 16, 2012, he submitted a sick-call slip complaining that he could barely see out of his left eye and that he required an eye exam or surgery. *Id*. at 96.

---

[3] The exhibits will be referenced by their electronic pagination.

b.     Medical Care at JCI

On February 17, 2012, Stewart was transferred to JCI. ECF No. 29-1, at 4. Per policy, he did not receive another intake examination. *Id.* In his sick-call slip dated May 5, 2012, Stewart indicated his eyes were examined in February of 2012, but as of May 5, 2012, he had not received his glasses.[4]  ECF No. 15-6, at 97.

On June 18, 2012, Stewart was seen by P.A. Moss about a skin rash. *Id*. at 21–22. On July 17, 2012, he was evaluated at nurse sick-call for a red, itchy, and irritated left eye. *Id*. at 23. On November 20, 2012 P.A. Moss examined Stewart's left and right eye and found the pupils were equal, round and reactive to light and accommodation, and his general eye condition appeared normal. *Id*. at 24–25. P.A. Moss advised Stewart that he was being referred to an optometrist for further evaluation. *Id.* at 25.

On December 7, 2012, ophthalmologist Amy Green-Simms evaluated Stewart. *Id.* at 124–26. He reported that a year earlier he had been struck in the eye with someone's thumb and that after seeing "yellow and red" for four months he had no vision in the left eye. *Id.* at 124. Dr. Green-Simms diagnosed Stewart as suffering from a macula-off retinal detachment to the left eye. *Id.* She found that surgical repair to restore his left eye was no longer an option because of the degree of detachment, the age of the injury, and the length of time Stewart reported he had been without vision in the eye. ECF No.15-8, at 3. Dr. Green-Simms prepared a routine referral for Stewart to a retinal specialist for further management recommendations. She further recommended poly-carbonate eyeglasses for protection of Stewart's right eye. A consultation for evaluation by the retinal specialist was approved. *Id.*

---

[4] Defendants assert that they have found no written record that Stewart's eyes were examined in February of 2012. ECF No. 15-1, at 5, n.5. Stewart's medical records indicate he wears glasses for astigmatism. ECF No. 15-6, at 4.

From January to March 2013, Stewart was seen by P.A. Moss four separate times for medical complaints concerning increased urination and an old femur fracture. ECF No. 15-6, at 26–35. He raised no complaints about his vision during those sick-call visits. On April 16, 2013, Stewart submitted a sick-call request complaining that he had a detached retina requiring surgery and that his vision was decreasing and his eye was starting to hurt. *Id*. at 106. Six days later, he was seen by P.A. Denvia Johnson for eye and leg pain. *Id.* at 36. P.A. Johnson referred Stewart back to Dr. Green-Simms for further evaluation of his eye. *Id.* at 36–37.

On May 26, 2013, Stewart complained of decreased vision out of his left eye. *Id.* at 107. On June 21, 2013, he was reevaluated by Dr. Green-Simms, who found no change in condition from the December exam. *Id*. at 127–29; ECF No. 15-8, at 2–3. She made another referral to a retinal specialist, which was approved on June 27, 2013. ECF No. 15-6, at 147. On August 6, 2013, Stewart was seen by N.P. Grace Akinpetide in response to his complaint of left eye redness. *Id*. at 41–42. Upon examination, his left eye was found to have discharge and redness, but no burning, pain, or vision loss. *Id.* He was prescribed erythromycin eye drops. *Id*. On August 27, 2013, when seen by N.P. Lum Maximuangu for an HCV diagnosis, it was noted that his eye appointment consult remained pending. *Id*. at 43.

On October 31, 2013, Stewart was seen by P.A. Moss for complaints related to chest pain. *Id*. at 47–48. On November 13, 2013, he was seen by Dr. Moultrie for a chronic care evaluation for HCV. *Id.* at 49–50. On November 26, 2013, Stewart was examined by P.A. Moss for complaints related to a fall. *Id.* at 51–52. The following day, a sick-call slip was received from Stewart requesting replacement glasses for those he had broken. *Id*. at 115. When seen by the optometrist on December 2, 2013, Stewart's vision in his right eye was 20/20 and "unrefractable" in his left eye due to trauma. *Id.* at 138–39. A prescription for new poly-carbonate glasses was issued. *Id.*

On December 6, 2013, Stewart submitted a sick-call slip inquiring into the status of his retinal specialist evaluation. *Id*. at 118. On December 12, 2013, he was seen by P.A. Moss to address his sick-call request regarding his pending retinal specialist consult. *Id*. at 58–59. Moss informed Stewart that he would check with the scheduler to determine the status of the consult. *Id*. On December 23, 2013, Stewart was seen at the Johns Hopkins Hospital Wilmer Eye Institute ("Wilmer") by ophthalmologist and retinal specialist Ron Gutmark. *Id.* at 130–31. He concluded that surgical intervention was not warranted and recommended prescriptions. *Id*. Gutmark noted that Stewart may benefit from a neurology consult. *Id*. Stewart was seen by P.A. Moss upon his return to the prison that same day and the prescriptions were issued. *Id*. at 60.

On January 30, 2014, P.A. Moss saw Stewart for his complaint of left-sided facial pain. *Id*. at 65. P.A. Moss requested a neurological evaluation on Stewart's behalf. *Id.* at 65. On February 6, 2014, Stewart was provided a new pair of poly-carbonate glasses. *Id*. at 67.

On February 20, 2014, P.A. Moss's request for a neurology consult was discussed between the utilization physician and Dr. Summerfield, an ophthalmologist. *Id*. at 68. Dr. Summerfield requested the consult notes from Wilmer to discuss the consult with Dr. Green-Simms. *Id*. On February 25, 2014, Stewart was seen by N.P. Akinpetide for his complaint of left eye redness. *Id*. at 69–70. He was provided eye patches and ointment. *Id*.

On February 26, 2014, Stewart was seen by Dr. Moultrie for chronic care related to his HCV. Moultrie noted Stewart's history of positive visual disturbance related to his retinal detachment and requested that Stewart be reevaluated by ophthalmology for follow-up in the management of the condition. *Id*. at 71–72. When seen by P.A. Moss on March 18, 2014, for "bumps on skin" Stewart made no complaints regarding his left eye. *Id*. at 73–74. On April 10, 2014, however, P.A. Moss noted the need to check on the status of Stewart's neurology consult. *Id*. at 75–76.

On May 6, 2014, Stewart was referred back to the optometrist for an assessment of his vision. *Id.* at 140–42. After an exam and review of Stewart's history, the optometrist recommended adding a tint to Stewart's poly-carbonate lenses and referred him back to the ophthalmologist. *Id.* On May 9, 2014, Stewart was seen by Dr. Green-Simms, who adjusted his prescriptions to address his continued pain. *Id.* at 134.

In May and June of 2014, Stewart complained of pain in his left eye and his need for new eyeglasses. ECF No. 30-3, at 6–7. He received the eyeglasses on June 27, 2014. *Id.* at 10. On July 3, 2014, Stewart was seen by the ophthalmologist, who adjusted his prescriptions to reflect his pain and increased inflammation. *Id.* at 11. On October 3, 2014, Stewart was seen in the Optometry Clinic for an examination for requested eyeglasses with dark-tint, poly-carbonate lenses. *Id.* at 38. He received the eyeglasses on October 23, 2014. *Id.* at 44. Stewart was again seen by Dr. Green-Simms on April 23, 2015 for facial pain. *Id.* at 70. Dr. Green-Simms did not find that Stewart's eye was causing his facial pain, but suggested enucleation or evisceration of the eye if a "neurology specialist had nothing to add." *Id.* Stewart declined enucleation or evisceration of the eye. *Id.* He was approved for a neurology appointment at Bon Secours Hospital. *Id.* at 71. P.A. Moss affirms that Stewart continues to be followed by the ophthalmology department and to have "access to the medical staff through the sick call process for his vision needs." ECF No. 15-7, at 5.

B.      Legal Analysis

Viewing the allegations in a light favorable to Stewart, there is no dispute that he suffered trauma to his left eye at BCDC, which resulted in a detached retina. He reported the injury soon after, but an examination could not be conducted because of excessive tearing and redness. He was referred to an optometrist, but had to file another sick-call request on January 27, 2012, because after thirty days he was still waiting for the referral and his eyesight was getting worse.

The named Defendants, however, are associated with the care he received at JCI, where he arrived on February 17, 2012. Once Stewart informed the JCI staff of his eye issues, they evaluated his eye, and he was prescribed eyeglasses, eye drops, steroid treatments, and pain medication. He was also referred to an ophthalmologist. Unfortunately, when seen by the ophthalmologist in December of 2012, he was diagnosed with an inoperable retinal detachment to his left eye and referred to a retinal specialist per a routine appointment for management purposes. The referral was twice made and not approved until June of 2013, at which time he was seen at Wilmer. During the relevant time period, Stewart raised a number of sick-call requests related to other issues such as a rash, chest pain, HCV, and femur/thigh pain and weakness. Each time he filed a sick-call request regarding his left eye vision and pain, he was seen by healthcare staff. While Stewart may be dissatisfied with the dilatory process involving his referral and appointment to a retinal specialist, given the nature and schedule of his sick-call requests, the care he received does not evince deliberate indifference on the part of the named Defendants. Stewart has not demonstrated an Eighth Amendment violation.[5]

V.     CONCLUSION

For the aforementioned reasons, Defendants' motions are granted. A separate Order follows.


Dated: January 21, 2016                                     /s/
                                                            ROGER W. TITUS
                                                            UNITED STATES DISTRICT JUDGE

---

[5] Although the Court finds no Eighth Amendment violation on the part of the named Defendants, the Court questions the continuity of care Stewart received from BCDC after his injury, given that his injury required immediate treatment to improve his chance of recovery. *See* W.H. Ross, *Visual Recovery After Macula-Off Retinal Detachment*, 16 Eye 440 (2002), http://www.ncbi.nlm.nih.gov/pubmed/12101451.